UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:__01/31/2020__

-------------------------------------------------------- X
            :

IN THE MATTER OF THE COMPLAINT OF  :
MANHATTAN BY SAIL, INC. and        :
SHEARWATER HOLDINGS, LTD., as Owners, :
Operators, and Agents of the Excursion sailing  :
vessel, Shearwater Classic Schooner FOR   :
EXONERATION FROM OR LIMITATION OF :
LIABILITY.                          :
            :

-------------------------------------------------------- X

12-CV-8182 (VEC)

OPINION AND ORDER

VALERIE CAPRONI, District Judge:

The Court must determine the value of a unique sailing vessel for which, the parties agree, there is no active market. Petitioners Manhattan by Sail, Inc. and Shearwater Holdings, Ltd. (together, "Petitioners") are the owner/operators of a vessel known as the Shearwater Classic Schooner ("Shearwater"), whose employee's negligence injured Respondent, Charis Tagle, a customer aboard the Shearwater on April 30, 2011. *See Manhattan by Sail, Inc. v. Tagle*, 873 F.3d 177, 179, 184–85 (2d Cir. 2017). The parties have been unable to agree on "the value of the vessel and its pending freight," which, pursuant to the Limitation of Liability Act, represents Petitioners' maximum liability. *See* 46 U.S.C. § 30505; *Manhattan By Sail, Inc. v. Tagle*, No. 12-CV-8182, 2018 WL 6684768, at *4 (S.D.N.Y. Sept. 14, 2018). This Court held an evidentiary hearing at which three witnesses for Petitioners and one witness for Respondent testified. The Court heard from Petitioners' proposed expert, Rik van Hemmen, and Respondent's proposed expert, Roy Scott, each of whom is subject to a pending motion to exclude. Van Hemmen opined that the value of the vessel on the date of the incident was $300,000; Scott opined that the value of the vessel on that date was $750,000 to $850,000. Although each expert credibly testified to a variety of objective data points that could be relevant

to determining the value of the vessel, neither was particularly credible or persuasive in explaining how he arrived at specific values.[1]  As required by Rule 52 of the Federal Rules of Civil Procedure, this opinion constitutes the Court's factual findings and legal conclusions regarding the value of the vessel and its pending freight and, accordingly, the limitation on Petitioners' liability.

## I.    FINDINGS OF FACT

### A.  The Shearwater

1.      The Shearwater is an 82-foot, 36 gross tons, auxiliary sailing vessel built in 1929 from native hardwoods and is nationally registered under U.S.C.G. Document No. 228487.  Joint Pretrial Order (Dkt. 63) at 5; Tr. (Dkt. 105) at 9, 80.

2.      The Shearwater is certified by the United States Coast Guard to carry up to 49 passengers for hire.  Tr. (Dkt. 105) at 29–30, 80.

3.      Petitioners purchased the Shearwater, along with her previous owner's business, for $525,000 in 2001.  Tr. (Dkt. 105) at 79, 92.  The acquisition included the previous owner's client list, website, and good will.  Tr. (Dkt. 105) at 79.  At the time it was purchased, the Shearwater was outfitted for overnight travel.  Tr. (Dkt. 105) at 83.  It had a full galley as well as refrigeration and a water maker, all of which Petitioners determined to be unnecessary to their intended use.  Tr. (Dkt. 105) at 83.  That equipment was replaced with features more suited for a catering business.  Tr. (Dkt. 105) at 83.

---

[1]      Explanations of rationales and calculations were consistently inadequate.  *See, e.g.*, Tr. (Dkt. 105) at 16 (van Hemmen miscalculating the Shearwater's annual revenue), 33 (van Hemmen basing the Shearwater's value on one purportedly comparable sale), 34 (van Hemmen failing to explain why valuation did not change between 2010 and 2011), 141 (Scott failing to explain how he arrived at depreciation estimate of 30%), 164 (Scott acknowledging he had no "quantifiable answer").

4. The value of the business acquired by Petitioners, apart from the vessel itself, is minimal. The Shearwater was generating only about $250,000 in annual revenue *circa* 2001. *See* Tr. (Dkt. 105) at 79. Although no direct evidence was presented of associated costs, the Court credits van Hemmen's testimony that the cost of a captain and a crew member, plus fuel expenses, insurance, and advertising, meant that profit margins would be minimal if revenue were approximately $250,000. *See* Tr. (Dkt. 105) at 18, 79.

5. Ten years later, in 2011, the Shearwater generated $635,047 in gross revenue and $124,722 in net income, after transitioning into the harbor-cruise business. Ex. P-1 (2011 Form 1120S for Shearwater Holdings Ltd.); Tr. (Dkt. 105) at 79–80. In 2010, the Shearwater generated a comparable $692,230 in gross revenue, and $113,416 in net income. Ex. P-1 (2010 Form 1120S for Shearwater Holdings Ltd.). Gross revenue was, therefore, about twice that of 2001, but the prior owner was operating in a different market.

6. In either 2002 or 2003, the Shearwater was severely damaged after a lift that was transporting the vessel drove over and fell into a septic tank. Tr. (Dkt. 105) at 86–87. Petitioners substantially rebuilt the Shearwater over a period of three or four years. Tr. (Dkt. 105) at 86–87. The reconstruction cost was between $500,000 to $600,000, not including legal and other costs which brought the total figure to approximately $700,000. Tr. (Dkt. 105) at 86–87. Although Thomas Berton, testifying as Petitioners' sole shareholder, was unsure of the precise timeline of the accident and repair, the repairs were completed no later than 2006 because the Shearwater generated revenue that year. *See* Tr. (Dkt. 105) at 86–87; Ex. P-1 (2006 Form 1120S for Shearwater Holdings Ltd.).

7.      According to Shearwater Holdings Ltd.'s tax returns, for purposes of depreciation, the vessel was valued at $525,000, the original purchase price.  Tr. (Dkt. 105) at 96–97; Ex. P-1 (2006 Federal Depreciation Schedule).

8.      The rebuilding of the Shearwater increased its value relative to its pre-accident condition because the new parts extended the vessel's useful life, even though there were no upgrades unrelated to the repairs.  *See* Tr. (Dkt. 105) at 88, 118–19.

9.      Petitioners have also expended approximately $75,000 per year on routine maintenance of the Shearwater.  *See* Tr. (Dkt. 105) at 32.

10.     Creating a replica of a vessel like the Shearwater would cost between $1 million and $1.5 million, depending on whether modern construction methods were used.  Tr. (Dkt. 105) at 25, 44, 100–01.

**B.  Expert Opinions**

11.     Petitioners' expert witness, Rik van Hemmen, is an engineer at a marine consulting firm, which is in the business of appraising marine vessels.  Tr. (Dkt. 105) at 5.  Van Hemmen has been employed in that capacity since 1988.  Tr. (Dkt. 105) at 6.  He performed a pre-litigation valuation of the Shearwater in 2009 for financing purposes in an unrelated matter, concluding that the vessel was worth $300,000.    Tr. (Dkt. 105) at 8–9, 15.  His valuation for this case rests on his conclusion that the value of the Shearwater did not meaningfully change between 2009 and 2011.  Tr. (Dkt. 105) at 34.

12.     Respondent's expert witness, Roy Scott, is a marine surveyor and appraiser, who has been in that business for approximately 28 years.  Tr. (Dkt. 105) at 107–08.  Marine surveying involves inspecting vessels for damage and assessing their conditions.  Tr. (Dkt. 105) at 107–08.

4

13.     Prior to the hearing, Petitioners and Respondent each moved to exclude the other's expert as unreliable under Rule 702 of the Federal Rules of Evidence. *See* Dkt. 53 at 13 ("Mr. Scott's valuation of the vessel is unreliable."); Dkt. 56 at 4 ("The opinion of Petitioners' valuation expert, Rik van Hemmen, [is] not founded on any reliable principles or methodology.").

14.     During the hearing, Petitioners' expert, van Hemmen, disclosed for the first time the specific valuation methods he employed and the data on which he relied. Van Hemmen's valuation certificate, which had been previously disclosed, contained a glossary of appraisal terms and methods but did not identify the ones he utilized for the appraisal of the Shearwater. *See* Dkt. 55-2 at 2. Because van Hemmen did not disclose the full scope of his opinion and testimony before the hearing, Respondent later submitted proposed conclusions of law that would exclude van Hemmen's testimony pursuant to Rule 37(c)(1) of the Federal Rules of Civil Procedure. *See* Dkt. 107 at 17.

15.     According to both van Hemmen and Scott, there are three generally accepted methods for appraising a vessel: (1) the comparable-sales approach, (2) the income approach, and (3) the cost-minus-depreciation approach. *See* Tr. (Dkt. 105) at 6, 119. To improve the accuracy of a valuation, the appraiser should, when possible, use multiple appraisal methods to corroborate the results of each method and determine the value at which multiple appraisal methods converge. *See* Tr. (Dkt. 105) at 10–11.

16.     A generally accepted method of calculating depreciation is to reduce the value of a vessel by 10% of its original value for the first five years of its useful life. Tr. (Dkt. 105) at 124. After the first five years, the base value of the vessel is updated (to 50% of the original

value), and annual depreciation continues to occur at 10% of the updated base value.  Tr. (Dkt. 105) at 124.

17. Van Hemmen's opinion that the Shearwater should be valued at $300,000 because a comparable but slightly more capable vessel named the Imagine was purchased and made seaworthy for a total price of $400,000 is, at best, of limited persuasive value because it is based on a single data point in a largely illiquid market.  *See* Tr. (Dkt. 105) at 13.  The Imagine was offered for sale in 2006 for $625,000 before eventually being sold for $200,000.  *See* Tr. (Dkt. 105) at 13.  The Imagine then required approximately $200,000 in improvements before it was seaworthy.  *See* Tr. (Dkt. 105) at 13.  Van Hemmen's heavy reliance on that example is misplaced because (1) it is a single comparable sale, (2) he was not sure when the sale was effectuated between 2006 and 2010, which meant that he could not compare market conditions, and (3) he did not explain in detail how the Imagine was similar to the Shearwater, other than both being sailing vessels certified by the Coast Guard.  *See* Tr. (Dkt. 105) at 13.  The failure to explain the comparison between the Imagine and the Shearwater is particularly glaring in light of van Hemmen's admission that the Shearwater is a unique vessel, and that no other vessel like it is likely to be on the market.  *See* Tr. (Dkt. 105) at 53.

18. Van Hemmen's opinion that the Shearwater should be valued at $300,000 because it generates $250,000 per year in revenue is completely unreliable.  *See* Tr. (Dkt. 105) at 15. Van Hemmen testified he arrived at the $250,000 figure based on an estimate of 50 trips a year for 50 people at $50 per person, which is inaccurate for a multitude of reasons.  *See* Tr. (Dkt. 105) at 16.  First, he had no knowledge of the Shearwater's actual revenue, and the $250,000 revenue figure is less than half of what was reported on Shearwater Holding Ltd.'s federal tax returns.  *See* Tr. (Dkt. 105) at 50–51.  Based on his faulty assumptions, van Hemmen opined that

the Shearwater essentially generates no profit because of high maintenance and other costs—a conclusion also contradicted by several years of tax returns. *See* Tr. (Dkt. 105) at 18; Ex. P-1 (2006–2011 Form 1120S for Shearwater Holdings Ltd.). Finally, 50 trips a year for 50 people at $50 per person yields a total of $125,000, not $250,000. As such, van Hemmen's conclusion as to the income-based valuation is entirely baseless.

19.     Van Hemmen's valuation in this matter is based on a prior appraisal of the Shearwater, which was requested by a financing company when Petitioners sought to use the vessel as collateral. *See* Tr. (Dkt. 105) at 89. Petitioners were disappointed with the valuation of $300,000 and had expected that the vessel would have a higher appraised value. *See* Tr. (Dkt. 105) at 98.

20.     Scott's opinion that the Shearwater is worth $750,000 to $850,000 is also unreliable. Scott derived his value by starting with the purchase price of $525,000, adding $700,000 for repairs made after it was purchased, and subtracting depreciation. *See* Tr. (Dkt. 105) at 129–30. The $700,000 figure is inflated, because only between $500,000 and $600,000 was actually expended towards the physical repair and improvement of the vessel. *See* Tr. (Dkt. 105) at 87. Additionally, because the Shearwater was heavily damaged, it was worth less than its pre-accident value of $525,000 until it was repaired. As such, a substantial portion of the $500,000 to $600,000 in repair costs was spent restoring the post-accident Shearwater to her pre-accident baseline condition. While the Court credits Scott's opinion that the new parts made the Shearwater more valuable, as compared to the pre-accident Shearwater, by extending the life of the vessel, the repairs generated far less than a dollar-for-dollar increase in the vessel's value, and there is no evidence in the record from which the Court could quantify the length and value

of the extension.[2]  *See* Tr. (Dkt. 105) at 118, 163–66.  At the hearing, Scott opined that the Shearwater increased in value by $0.50 for every dollar invested in her repair, but when pressed by the Court, could not explain how he arrived at the 50% discount.  *See* Tr. (Dkt. 105) at 164–66.  Although Scott later testified that he reached his figure based on "experience," the Court does not find his testimony credible because Scott acknowledged that he had "almost no data" to which he could apply his experience.  *See* Tr. (Dkt. 105) at 166.

21.     Scott's testimony that insurance companies typically do not insure property at a value greater than 10% of its surveyed value carries some weight because of his experience working as an insurance adjustor, *see* Tr. (Dkt. 105) at 107, 113–14, 136, but his theory does not apply to this case.  Berton and a former employee of the insurer both testified credibly that the insured value was simply a value agreed upon by the Petitioners, the broker, and the underwriter.  *See* Tr. (Dkt. 105) at 69–70.  While the "agreed-upon" value could track the vessel's market value, it does not have to.  *See* Tr. (Dkt. 105) at 70.  Here, the insurer did not appear to have followed Scott's rule of thumb because the insurer did not appraise the Shearwater before agreeing to the total loss value of $800,000.  *See* Tr. (Dkt. 105) at 89 (Berton explaining that the Shearwater had only been appraised once before, for purposes of obtaining financing, not insurance).

## C.  Valuation

22.     Because the Shearwater is a historic vessel that has no active market and no appropriate comparator in terms of profits, none of the three valuation methods can be mechanically applied in this case.

---

[2]      For instance, Berton testified that the repairs associated with the septic tank incident involved replacing 60–80% of the hull and frames.  Tr. (Dkt. 105) at 87.  There was, however, no evidence of how often a hull has to be repaired nor how expensive it is to restore one.

23.     The comparable sales approach cannot reliably estimate the Shearwater's value in 2011 because there is no active market for comparable vessels from which adequate sales information could be derived.  The only comparable sale, between 2006 and 2012, that either expert could point to is the $400,000 valuation of the Imagine, but the Court lacks sufficient information to assess the vessel's similarity to the Shearwater, or to compare market conditions.  Given the weakness of that comparison, the Court cannot endorse van Hemmen's complete reliance on a single data point to determine the value of the Shearwater.  Although there were "some" schooners of similar size to the Shearwater listed for sale between 2006 and 2012, none appeared to have been sold during that period.  *See* Tr. (Dkt. 105) at 160.  Moreover, if the Imagine is any indication, there can be a substantial spread between the asking price and selling price of this sort of old sailing vessel.

24.     The rationale behind the comparable sales approach, however, does indicate that the Shearwater's purchase price in 2001 is a useful reference point for determining its subsequent value, absent any indication that the 2001 price was unusually high or low or that the market moved substantially higher or lower since 2001.  *See* Tr. (Dkt. 105) at 129.

25.     The income approach also cannot generate a reliable estimate because the record contains no evidence as to how the value of a vessel can be calculated using annual profits.  Although the Shearwater was generating approximately twice as much revenue in 2011 as it did in 2001, that does not mean that the vessel doubled in value.  The Shearwater's profits in 2001 are not part of the record, which makes it difficult to draw a direct comparison to 2001.  Moreover, the Shearwater's previous owner catered exclusively to private events and derived no income from tourism.  *See* Tr. (Dkt. 105) at 79.  Because the previous owner earned substantially

less revenue while serving a different market, the Court cannot reliably use the Shearwater's revenue figures from 2001 to extrapolate its value in 2011.

26.     Under the cost-plus-depreciation approach, calculating depreciation from 1929, the year that the Shearwater was first built, is infeasible. *See* Tr. (Dkt. 105) at 124. Nevertheless, because the Shearwater was substantially rebuilt in 2006 following a serious collision with a septic tank, applying a cost-depreciation approach starting from 2006 is an appropriate alternative. Because the accident occurred approximately a year after Petitioners' purchase of the Shearwater for $525,000, the vessel's pre-accident value is $472,500 (depreciation for one year at 10% of purchase price).

27.     After the repairs for the collision were completed in 2006, the vessel was worth more than $472,500. The installation of new parts, which cost between $500,000 and $600,000, extended the vessel's useful life. The Shearwater in 2006 was nevertheless worth less than $1 million, the cost to create a completely new replica, because a restored vessel with a history of severe damage is typically less valuable than a vessel without such history. *See* Tr. (Dkt. 105) at 145. Because the insurance company ultimately reimbursed Petitioners $225,000 in repair costs for the septic tank accident, *see* Tr. (Dkt. 105) at 104, that figure serves as an approximation for what was necessary to restore the Shearwater to its pre-accident condition—the remainder of Petitioners' $325,000 in "hard costs" stemming from the accident are then value-adds to the vessel.[3] That modified cost approach therefore indicates that the Shearwater was worth $797,500 in 2006 once it was fully repaired. Applying a depreciation rate of 10% for five years (from 2006 to 2011) halves the value of the Shearwater to approximately $400,000.

---

[3]     While Berton testified that the repairs did not include any upgrades unrelated to the accident, Petitioners do not appear to dispute that the addition of new parts extended the useful life of the vessel and thereby increased its value. *See* Tr. (Dkt. 105) at 88.

28.     During and after Respondent's accident, the Shearwater was insured for an agreed-upon value of $800,000.  Tr. (Dkt. 105) at 70, 84–85, 105.  The agreed-upon value does not always reflect market value because the vessel could be either under-insured or over-insured.  Tr. (Dkt. 105) at 70, 131–32.  Petitioners testified they over-insured the vessel in order to account for cost of repair or replacement, plus "crew costs" in the event of a major interruption of half a season or more, and to decrease the probability that in the face of major damage to the vessel the insurance company would "total" it.  Tr. (Dkt. 105) at 85, 88.  According to Shearwater Holdings Ltd.'s 2011 tax return, annual cost of goods sold is approximately $250,000, which the Court adopts as a proxy for "crew costs" in the absence of other more specific cost figures.  *See* Ex. P-1 (2011 Form 1120S for Shearwater Holdings Ltd.); Berton Dep. Tr. (Dkt. 60-3) at 53.  Crediting Petitioners' testimony that the vessel was over-insured at $800,000, to account for replacement costs and crew costs in the event of a major interruption, the insured value of $800,000 indicates that the actual value of the Shearwater was approximately $550,000.

29.     The fact that Petitioners expended approximately $700,000 (inclusive of reconstruction, legal, and other costs), approximately $225,000 of which was reimbursed by its insurance carrier, to fully restore the Shearwater is some indication that the vessel was worth at least $475,000 to Petitioners.  Tr. (Dkt. 105) at 87, 104.  The Court notes, however, that Berton has a specific interest in historic, wooden, sailing vessels and may be willing to pay more than the Shearwater's market value to restore it, despite the vessel being a business asset.  *See* Tr. (Dkt. 105) at 90–91.

30.     Taking all of those datapoints and the remaining evidence into consideration, the Court finds that the Shearwater was worth $450,000 on April 30, 2011, the date of Respondent's injury and voyage.

31.     The pending freight, or earnings, from the trip on April 30, 2011, is approximately $2,400, based on 48 passengers paying $45 each.  *See* Berton Dep. Tr. (Dkt. 60-3) at 88–89 (testifying that full-priced ticket is $45 for non-sunset cruises); Trial Tr. (Dkt. 75) at 220 (testifying as to captain's log showing 48 passengers aboard).

## II.     CONCLUSIONS OF LAW

### A.  Motions to Exclude Expert Testimony

1.     When the Court serves as the factfinder, "expert testimony should [generally] be admitted so that the Court could have the benefit of live testimony and cross-examination to determine how much weight, if any, to give to the expert's conclusions."  *Joseph S. v. Hogan*, No. 06-CV-1042, 2011 WL 2848330, at *2 (E.D.N.Y. July 15, 2011); *see also Williams v. Illinois*, 567 U.S. 50, 69 (2012) ("When the judge sits as the trier of fact, it is presumed that the judge will understand the limited reason for the disclosure of the underlying inadmissible information and will not rely on that information for any improper purpose."); *Bic Corp. v. Far E. Source Corp.*, 23 F. App'x 36, 39 (2d Cir. 2001) ("[T]he admission of evidence in a bench trial is rarely ground for reversal, for the trial judge is presumed to be able to exclude improper inferences from his or her own decisional analysis."); *720 Lex Acquisition LLC v. Guess? Retail, Inc.*, No. 09-CV-7199, 2014 WL 4184691, at *10 (S.D.N.Y. Aug. 22, 2014) ("[U]nless the disputed evidence is wholly irrelevant or so speculative as to have no probative value, it is appropriate for the Court to take in the evidence freely and separate helpful conclusions from ones that are not grounded in reliable methodology." (citation omitted)).

Because there is no need for the Court to "gate-keep expert testimony from [itself]," *Hogan*, 2011 WL 2848330, at *2, the parties' pre-hearing motions to exclude van Hemmen and Scott as unreliable under Rule 702 of the Federal Rules of Evidence are denied as moot.

2.      Under Rule 37(c)(1), "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). Respondent argues that van Hammen's testimony should be excluded because Petitioners did not disclose, prior to the hearing, the methodology he used to value the vessel. *See* Dkt. 107 at 17. Exclusion of testimony is a form of sanction, the propriety of which hinges on "(1) the party's explanation for the failure to comply with the disclosure requirement; (2) the importance of the testimony of the precluded witness[]; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and (4) the possibility of a continuance." *Patterson v. Balsamico*, 440 F.3d 104, 117 (2d Cir. 2006) (quotation marks omitted) (citing *Softel, Inc. v. Dragon Med. & Scientific Commc'ns, Inc.*, 118 F.3d 955, 961 (2d Cir. 1997)).

3.      Although Petitioners have not explained their failure to comply with their disclosure obligations, the other factors do not weigh in favor of exclusion.

4.      Respondent is correct that the subject of van Hemmen's testimony is "important," in the sense that it goes to the central issue of the proceeding, the valuation of the vessel—but the fact that the evidence at issue is important weighs *against* exclusion. *See Softel*, 118 F.3d at 962.

5.      Respondent was only minimally prejudiced, if at all, by van Hemmen's extra-report testimony at the hearing. During the hearing, van Hemmen testified generally as to

acceptable methods of appraisal, which were the same ones endorsed by Respondent's expert, Scott. *See* Tr. (Dkt. 105) at 6, 119.

6.      Van Hemmen also testified as to how each of the three appraisal methods were applied to the Shearwater, but his testimony was largely unreliable or favorable to Respondent's position. Regarding the construction cost minus depreciation model, van Hemmen testified that he ultimately abandoned that approach because, given the age of the Shearwater, depreciation was impracticable. *See* Tr. (Dkt. 105) at 26–27. Respondent, accordingly, was not prejudiced by van Hemmen's failure to disclose a method he did not use; to the extent that Respondent believed construction cost minus depreciation could be a viable method, her expert could and did testify to that effect. *See* Tr. (Dkt. 105) at 124. Regarding the income method, as explained earlier in this opinion, the Court finds van Hemmen's conclusion unreliable and gives it no weight. Regarding the comparable-sales method, van Hemmen testified that he examined sales data for a vessel comparable to the Shearwater. Tr. (Dkt. 105) at 13. But his analysis lacked precise dates, and the only sale that van Hemmen could discuss with any specificity involved the Imagine, which Respondent's counsel was able to effectively undermine on cross-examination. Tr. (Dkt. 105) at 13, 33. While Respondent's expert did not have a prior opportunity to research the Imagine and specifically reject that comparison, Scott testified that, given the uniqueness of the Shearwater, there is no effective comparator vessel, rebutting van Hemmen's comparable-sales approach. Tr. (Dkt. 105) at 121–22. Van Hemmen himself acknowledged that the Shearwater is unique and that no other vessel like it is on the market, further undermining the weight of his own comparison. *See* Tr. (Dkt. 105) at 53. Moreover, van Hemmen testified that the Imagine was offered for sale at $625,000 and ultimately cost $400,000 to purchase and make seaworthy; that testimony, even if credited by the Court, partially benefits Respondent because

14

those figures are well above van Hemmen's valuation. *See* Tr. (Dkt. 105) at 13. The inclusion of van Hemmen's testimony therefore caused minimal, if any, prejudice to Respondent.

7. Finally, the availability of a continuance is a neutral factor because, while an adjournment of the evidentiary hearing would have caused delay, it would not have been as disruptive as the adjournment of a jury trial and would not have affected any other deadlines. In any event, Respondent did not ask for an adjournment, and her failure to depose van Hemmen was at least in part responsible for the late disclosure.

8. Pursuant to Rule 37(c)(1), the Court declines to exclude van Hemmen's testimony because Petitioners' failure to make a timely disclosure was harmless.

**B. Limitation of Liability**

9. If a petition for limitation of liability is granted pursuant to the Limitation of Liability Act, as occurred in this case, "the owner can be liable on the covered claims only up to the total value of his vessel and its pending freight." *See Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243–44 (2d Cir. 2014); *see also* 46 U.S.C. § 30505(a) ("[T]he liability of the owner of a vessel for any claim, debt, or liability described in subsection (b) shall not exceed the value of the vessel and pending freight.").

10. The value of the vessel is determined as of the completion of the voyage during which the claimed incident occurred. *See In re Aramark Sports & Entm't Servs., LLC*, 831 F.3d 1264, 1272 (10th Cir. 2016) ("[I]f the ship is lost [during the voyage], the value is zero." (citing *Pickle v. Char Lee Seafood, Inc.*, 174 F.3d 444, 449 (4th Cir. 1999))); *see also Red Star Barge Line, Inc. v. Nassau Cty. Bridge Auth.*, 683 F.2d 42, 43 (2d Cir. 1982) ("[T]he owner's interest in the ship is to be calculated according to its value after the collision has taken place." (interpreting prior version of statute)). Because contemporaneous sales of like property are unavailable,

owing to the uniqueness of the Shearwater vessel and the illiquidity of the market for historic schooners, the Court must examine the totality of the circumstances to approximate the market value of the vessel. *See Standard Oil Co. of New Jersey v. S. Pac. Co.*, 268 U.S. 146, 155–56 (1925) ("Where there is no market value, such as is established by contemporaneous sales of like property in the way of ordinary business, as in the case of merchandise bought and sold in the market, other evidence is resorted to . . . . It is not a matter of formulas, but there must be a reasonable judgment having its basis in a proper consideration of all relevant facts."); *Ozanic v. United States*, 165 F.2d 738, 740 (2d Cir. 1948) ("There is no one fixed basis which is decisive where a free and open market for such ships does not exist to establish fair market value. Rather, the basis of valuation is a composite one which gives an end result in each instance approximating actual value as closely as possible.").

11.    The term "pending freight" refers to "the total earnings for the voyage, both prepaid and uncollected." *In re Aramark Sports & Entm't Servs.*, 831 F.3d at 1272; *see also The Main v. Williams*, 152 U.S. 122, 131 (1894) (explaining that "freight" includes passenger fares); *The Black Eagle*, 87 F.2d 891, 894 (2d Cir. 1937) ("'Freight then pending' simply refers to the earnings of the voyage.").

12.    Petitioners bear the burden of "show[ing] the value of his interest in the vessel and her pending freight." *See In re W.E. Hedger Co.*, 59 F.2d 982, 983 (2d Cir. 1932).

13.    Based on the foregoing facts and conclusions of law and all of the evidence adduced during the hearing, and utilizing all of the available means of reliably approximating the market value of the Shearwater, the total value of the Shearwater and its pending freight was **$452,400**, immediately following Respondent's injury and the vessel's voyage on April 30,

2011.  Petitioners are therefore entitled to limit their liability to Respondent in this matter to **$452,400**.

### III.  CONCLUSION

The parties are directed to appear for a status conference with the Court at **10:00 a.m. on February 28, 2020**.  On or before **February 20, 2020**, they must provide the Court with a joint pre-conference letter summarizing their proposed next steps in this litigation, including whether a referral to mediation or a magistrate judge for a settlement conference would be helpful.  If the parties desire an immediate referral in lieu of a conference, they may so request.

**SO ORDERED.**

**Date:  January 31, 2020**                                         **VALERIE CAPRONI**
       **New York, NY**                                              **United States District Judge**